# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| MARCIA EGGLESTON, as Administrator of the Estate of RODNEY GEISER, Deceased c/o William E. Walker, Jr. Esquire, Attorney at Law, 333 Erie Street South #192, Massillon, Ohio 44646, | CASE NO.: 5:20-cv-02757 |

CASE NO.: 5:20-cv-02757

JUDGE:

**AMENDED COMPLAINT (For Wrongful Death; 42 U.S.C. §1983; Title II Americans with Disabilities Act and State Law Claims)**

Plaintiff,

v.

WAYNE COUNTY, OHIO
c/o DANIEL R. LUTZ
Wayne County Prosecuting Attorney
County Administration Building
215 West Liberty Street
Wooster, Ohio 44691
330.262.3030

and

WAYNE COUNTY BOARD OF
COMMISSIONERS
County Administration Building
428 West Liberty Street
Wooster, Ohio 44691

and

TRAVIS HUTCHINSON
Wayne County Sheriff
201 West North Street
Wooster, Ohio 44691

and

DOUGLAS HUNTER
Wayne County Sheriff's Office
201 West North Street
Wooster, Ohio 44691

*PLAINTIFF INCORPORATES BY REFERENCE THE EXHIBITS SUBMITTED HEREWITH WITH THE SAME FORCE AND EFFECT AS IF HERIN EXPRESSLY SET FORTH*

**JURY DEMAND ENDORSED HEREON**

and
ERIC PETERS
Wayne County Sheriff's Office
201 West North Street
Wooster, Ohio 44691

Defendants.

## I.    INTRODUCTION

1. This is an action for money damages and other relief arising from the shooting death of

   RODNEY GEISER on December 16, 2018 at Apple Creek, Ohio in Wayne County.

   RODNEY GEISER was emotionally disturbed and was fatally shot by a Wayne County

   Sheriff's Deputy, while GEISER was holding a gun to his own head and not making any

   threatening gestures to anyone else.  GEISER was killed by an on-duty law enforcement

   officer of Wayne County, Ohio in violation of GEISER's rights under the United States

   Constitution and the common law. Plaintiff brings this civil rights and state law action to

   secure fair compensation and to encourage Defendants and others to refrain from the

   unnecessary use of deadly force against emotionally disturbed civilians in the future.

## II.    JURISDICTION AND VENUE

2. This Court has jurisdiction to hear the federal civil rights violations in this matter under 28

   U.S.C. §1331 (federal question) and 28 U.S.C. §1343(a)(3)-(4) (civil rights) and

   supplemental jurisdiction to hear the common law claims under 28 U.S.C. §1367.

3. This action is brought pursuant to claims arising under the laws of the State of Ohio, 42 U.S.C. §1983, and the Fourth and Fourteenth Amendments to the United States Constitution. This action is also brought pursuant to 28 U.S.C. §§ 1983, 1985, and 1988 as it is also an action for compensatory damages, punitive damages, and attorney fees.

4. Venue is proper in the Northern District of Ohio, Eastern Division, as all acts herein mentioned occurred in WAYNE COUNTY, Ohio.  The decedent, RODNEY GEISER was a resident of Wayne County, Ohio at the time of his death.

## III.    PARTIES

5. Plaintiff, MARCIA EGGLESTON is the duly appointed Administrator of the Estate of RODNEY GEISER.  Marcia Eggleston was appointed by the Wayne County Probate Court on November 12, 2020. She brings this action for the benefit of his heirs and next of kin.

6. Defendant WAYNE County, Ohio, is a unit of local government organized under the laws of the state of Ohio. Defendant WAYNE County, Ohio, is a "person" under 42 U.S.C. § 1983 and at all relevant times to this case acted under color of law.

7. Defendant WAYNE COUNTY BOARD OF COMMISSIONERS is a unit of local government organized under the laws of the State of Ohio.  Defendant WAYNE COUNTY BOARD OF COMMISSIONERS is a "person" under 42 U.S.C. § 1983 and at all relevant times to this case acted under color of law.

8. Defendant TRAVIS HUTCHINSON is the duly elected Sheriff of WAYNE County, and is being sued in his individual and his official capacity. Defendant HUTCHINSON was, at all pertinent times, the supervisor of Defendants Captain HUNTER and Sergeant PETERS and was responsible for their employment, retention, training, supervision, and for all their conduct, especially while on duty and in the possession of firearms issued by WAYNE

County Sheriff's Office. Defendant HUTCHINSON was also responsible for training, developing, implementing, and enforcing the regulations of the WAYNE County Sheriff's Office, and for ensuring that Defendants HUNTER and PETERS obeyed the laws of the State of Ohio.

9. Defendant DOUGLAS HUNTER was at all times relevant to this action employed as a Captain by the Wayne County Sheriff's Office. Although not physically present at the time of the killing, Defendant HUNTER personally participated in the decisions and events via orders he issued to Defendant PETERS telephonically which deprived RODNEY GEISER's constitutional rights. Defendant HUNTER is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is sued individually and in his official capacity as an employee of Wayne County.

10. Defendant ERIC PETERS was at all times relevant to this action employed as a Sergeant by the Wayne County Sheriff's Office. Defendant PETERS personally participated in the events which deprived RODNEY GEISER's constitutional rights. Defendant PETERS is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is sued individually and in his official capacity as an employee of Wayne County.

## IV.    STATEMENT OF FACTS

11. RODNEY GEISER was a 60-year-old male who lived at 123 West Main Street, in Apple Creek Ohio, 44606 in Wayne County. He was a loving father of a 24-year-old son (DARRICK GEISER).

12. On Sunday morning December 16, 2018, while on routine patrol, Officer BRYAN NIEMAN received a telephone call at 10:47 a.m. on the Apple Creek Police Department's cellular phone that NIEMAN carried in his patrol car. The caller was DARRICK GEISER, son of

RODNEY GEISER. DARRICK was calling NIEMAN because his father, RODNEY was threatening to hurt himself. (Exhibit B Nieman Body Camera-1) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

13. RODNEY GEISER had a history of emotional problems and both the Apple Creek Police Department and the Wayne County Sheriff's Office were aware of these problems. (Exhibit C Nieman recorded interview with BCI.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]* At 10:59 a.m. (NIEMAN body camera time) NIEMAN and Deputy PETERS find RODNEY GEISER sitting alone at the rear of the Harvest Market.  As the officers began shouting commands to RODNEY GEISER, GEISER pulled out a gun and pointed it to his own head.  (Exhibit D *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

14. RODNEY did not point the gun at the officers or anyone else. (Exhibit D.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

15. At 10:59 a.m. RODNEY GEISER stands up to depart the vicinity of the Harvest Market. RODNEY GEISER continuously aims the gun at the right side of his own head and began to walk away. (Exhibits D & F.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

16. RODNEY GEISER departs the Harvest Market area and crosses S.R. 250 at Mill Street. RODNEY GEISER walks past cars, that had stopped at the stop sign on Mill Street at S.R. 250 and he also passes motorists who are purchasing gasoline at a nearby self-service station.

RODNEY GEISER paid NO attention to and did NOT threaten any of these people. (Exhibit D.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

17. RODNEY GEISER continues on Mill Street walking toward a car wash.  RODNEY GEISER passes numerous houses, and mobile homes arriving at the car wash at 11:05 a.m. (Exhibit D.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

18. RODNEY GEISER made no threatening gestures toward any member of public during his travels. (Exhibits D & F.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

19. RODNEY GEISER made no attempt to threaten any motorists or residents he passed along his way. (Exhibits D & F.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

20. At about 11:08 a.m. RODNEY GEISER departs the car wash and begins walking toward the Dollar Store and Post Office one block away on Maple. (Exhibit D&F.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

21. RODNEY GEISER again displayed no interest in area residents or homes.  RODNEY GEISER made no threatening gestures to anyone during his walk. (Exhibits D & F.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

22. Upon reaching the Dollar Store RODNEY GEISER walked to the rear of the empty parking lot and sat down at 11:10 a.m. (Exhibit D.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

23. While sitting NIEMAN continues to engage RODNEY GEISER in conversation.  At one-point NIEMAN successfully got RODNEY GEISER to re-pocket his handgun.  At this time Deputy ELIZABETH BUTLER transmitted that she was talking to family members of RODNEY GEISER.  BUTLER explained that RODNEY GEISER had stopped taking medication and this why he was having mental issues. (Exhibit G.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

24. At this same time TIM WADE, a friend of RODNEY GEISER, arrives on the scene near the Dollar Store and informs law enforcement that RODNEY GEISER has these suicidal episodes a couple of times a year when he goes off his meds. WADE informed the officers that RODNEY GEISER should be wearing down - as he has on previous occasions. (Exhibit H). *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

25. Around 11:09 a.m. PETERS' body camera records PETERS being handed a cellular phone by Deputy BEN RUBENSTEIN. [Exhibit F runtime at 16:48.] *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

26. PETERS uses the RUBENSTEN cellular phone to call the Wayne County Sheriff's Office to talk with Captain DOUGLAS HUNTER.  PETERS' body camera then records the telephone conversation between PETERS and HUNTER.  (Exhibit F.) *[Plaintiff incorporates by*

*reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

27. During this call PETERS can be heard telling HUNTER in essence that the police would need to kill RODNEY GEISER because GEISER was not stopping but continuing to walk around with a gun pointed at his own head. (Exhibit F. At runtime 18:35.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

28. During this PETERS – HUNTER telephone call, PETERS never states that RODNEY GEISER was pointing the gun or making threatening gestures with the handgun. PETERS only stated reason for contemplating the use of deadly force was simply because RODNEY GEISER was continuing to walk around town with a gun pointed at his own head. (Exhibit F. At runtime 18:30.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

29. HUNTER did not dissuade PETERS from using deadly force against RODNEY GEISER.

30. At 11:20a.m. RODNEY GEISER began walking again. RODNEY GEISER starts walking down the alleyway behind the Post Office toward Main Street (S.R. 250). About half-way down the alleyway, PETERS confronted RODNEY GEISER from a covered position behind a steel dumpster. (Exhibit D & F. At runtime 27:50.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

31. PETERS successfully re-channeled RODNEY GEISER's movements. RODNEY GEISER follows PETERS' commands and reverses course and turns around 180 degrees go back the way he had come. (Exhibit D.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

32. RODNEY GEISER returns to the Dollar General parking lot then turns left (northbound) and climbs a hill leading to High Street in front of the Picker Barn at 11:21 a.m. (Exhibit D.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

33. PETERS repositioned himself on the far side (north side) of High Street taking cover behind a parked car. (Exhibit H. At runtime 24:12 to 26:01.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

34. Later, PETERS admitted that RODNEY GEISER was yelling less and less at this time while RODNEY GEISER continued his journey on High Street. (Exhibit I. BCI interview with PETERS.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

35. PETERS commanded RODNEY GEISER once again to stop.  RODNEY GEISER complied, and a short conversation was had between PETERS and RODNEY GEISER. (Exhibit J. Picker Bard Security Camera.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

36. Then RODNEY GEISER bowed his head somewhat and began walking slowly away from PETERS.  RODNEY GEISER was still holding his gun to his own head when PETERS fired one shot at 11:23 a.m. - about 24 minutes after the officers first encountered RODNEY GEISER by the Harvest Market. (Exhibit J. Picker Bard Security Camera.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

37. There were about four cameras that captured the shooting.  Camera footage reveals that RODNEY GEISER started to continue his slow walk down High Street with the gun still

being held under his chin on the right side of his head.  Camera footage also reveals that RODNEY GEISER made no threatening gestures toward PETERS or anyone else at the precise time that he was shot.  When RODNEY GEISER began to walk away from PETERS, PETERS fired one rifle-round from about 30 feet away while crouched behind a parked automobile. (Exhibits H. & J.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

38. PETERS' .223 rifle-round ripped through RODNEY GEISER's right forearm and tore into his chest.  In the process the bullet destroyed RODNEY GEISER's aorta, lung and spleen.

39. RODNEY GEISER died from these wounds.

40. A group of officers gathered about RODNEY GEISER's body.  PETERS conversation is recorded by various body cameras.  Just two minutes after PETERS fatally shot RODNEY GEISER, PETERS is recorded by NIEMAN's body camera at 11:25 a.m. saying; "***We can't let him go no more man***." (Exhibit D. at 35:11 runtime.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

41. Police body cameras and area security camera footage was gathered by Ohio Bureau of Criminal Investigation Special Agents.  This footage shows that the street and the neighborhood on High Street at the scene of the shooting was empty and devoid of people. The footage shows that RODNEY GEISER was holding his gun to his own head which was bowed down as he slowly walked down the street when PETERS shot him.  At the precise moment that PETERS fatally shot RODNEY GEISER, GEISER did NOT pose an imminent danger to PETERS or anyone else. (Exhibits H & J.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

42. There were no "split-second" circumstances involved in PETERS shooting of RODNEY GEISER.  PETERS shot RODNEY GEISER from across the street while crouched behind a parked car. PETERS had contemplated and deliberated shooting RODENY GEISER for several minutes prior the shooting, and communicated the intent of shooting to his supervisor HUNTER. (Exhibits F, H & J.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

43. PETERS did not warn RODNEY GEISER that he would use deadly force on him if RODNEY continued to walk around town with a gun to his own head, as RODNEY GEISER was allowed to do for the previous 24 minutes. (Exhibits F & H.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

44. After PETERS shot RODNEY GEISER, Deputy Elizabeth BUTLER seized RODNEY GEISER's handgun from the ground.  BUTLER's body camera recorded her securing the gun in a cruiser.  And her body camera shows that when she "cleared" RODNEY GEISER's gun, the gun did NOT have a round chambered in the pistol.  Hence, RODNEY GEISER did not hold a ready-to-fire weapon to his head at any time. (Exhibit G. Butler body camera at runtime 53:03.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

## COUNT I

### Fourth Amendment – Unreasonable Seizure – Seizure without Probable Cause

45. Plaintiff hereby incorporates by reference all the allegations set forth in the foregoing paragraphs as if fully restated herein.

46. Defendant PETERS lacked probable cause to arrest RODNEY GEISER.  Body camera recordings of the participating officers recorded the officers repeatedly telling RODNEY GEISER that he (Geiser) was not under arrest and was not going to jail. (Exhibits D, F & H.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

47. PETERS continued this mantra right up to the moment PETERS shot RODNEY GEISER. (Exhibit F.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

48. Body camera recordings depict RODNEY GEISER as an emotionally disturbed man who was not committing any crimes or threatening any persons. (Exhibits D, F & H.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

49. Defendant PETERS seized RODNEY GEISER by shooting him.  PETERS acts violated RODNEY GEISER's right to be free from an unreasonable seizure in violation of the Fourth Amendment, enforceable through 42 U.S.C §1983.

## COUNT II

### Fourth Amendment – Unreasonable Seizure – Excessive Force

50. Plaintiff hereby incorporates by reference all the allegations set forth in the foregoing paragraphs as if fully restated herein.

51. Defendant PETERS used objectively unreasonable and excessive force in the shooting of RODNEY GEISER. (Exhibit H & J.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

52. At the precise moment PETERS shot RODNEY GEISER camera footage clearly shows that RODNEY GEISER was holding a gun to his own head and was in the process of walking away from PETERS with his head bowed. (Exhibits H & J.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

53. PETERS did not warn RODNEY GEISER that deadly force was going to be used against him. (Exhibit F & J.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

54. At the precise moment of the shooting, RODNEY GEISER did not pose an imminent threat to PETERS or anyone else, thus PETERS used unreasonable and excessive force when PETERS shot RODNEY GEISER to death. (Exhibits H & J.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

55. PETERS shooting of RODNEY GEISER, violated RODNEY GEISER's right to be free from an unreasonable seizure in violation of the Fourth Amendment, enforceable through 42 U.S.C. § 1983.

**COUNT III**

**Supervisory Liability**

56. Plaintiff hereby incorporates by reference all the allegations set forth in the foregoing paragraphs as if fully restated herein.

57. Supervisors can be liable just like a line officer if they participate directly in an event and fail to prevent a subordinate officer from violating a citizen's constitutional rights.

58. Defendant HUNTER was not at the scene at when PETERS shot RODNEY GEISER to death.

59. Approximately 12 Minutes before Defendant PETERS shot RODNEY GEISER, PETERS placed a telephone call to Capt. HUNTER. (Exhibit F runtime 18:56 to 31:12.) In this call, PETERS announced his intention to kill RODNEY GEISER for the reason that GEISER was walking around town holding a gun to his own head.  (Exhibit F. Runtime 17:05 to 18:56.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

60. HUNTER had an opportunity to explore all the facets of the incident with PETERS long before the of shooting.  HUNTER knew that PETERS intended to use deadly force against RODNEY GEISER because GEISER was walking around town while holding a gun to his own head. PETERS was recorded declaring to HUNTER - "We can't let him go no more." (Exhibit F. Runtime 20:37) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

61. HUNTER was aware of the potential risk of harm in that deadly force was being planned to be used against RODNEY GEISER as discussed in the recorded telephone call between PETERS and HUNTER. (Exhibit F. Runtime 17:05 to 18:56.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

62. During that call, PETERS declared his intentions to use deadly force against RODNEY GEISER because GEISER was continuing to walk around town holding a gun to his own head. (Exhibit F. Runtime 17:05 to 18:56.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

63. The PETERS body camera audio recording demonstrates that PETERS did NOT tell HUNTER that RODNEY GEISER was making any threatening gestures to anyone else. (Exhibit F.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

64. HUNTER failed to restrain PETERS from proceeding with a planned ambush to use deadly force even though no one was in imminent danger or subjected to threatening gestures.

65. HUNTER's failure to order PETERS to refrain from using deadly force was a conscious decision to disregard the risk that PETERS intended to kill RODNEY GEISER.

66. HUNTER's failure to countermand PETERS' declared intent of killing RODNEY GEISER constituted HUNTER's deliberate indifference to the risk of RODNEY GEISER being killed.

67. HUNTER's deliberate indifference to the risk to RODNEY GEISER being shot led directly to PETERS shooting RODNEY GEISER to death.

68. HUNTER's failure to control his subordinate (PETERS) and prevent the excessive, unlawful and unconstitutional use of deadly force deprived RODNEY GEISER of his rights, privileges, and immunities secured to RODNEY GEISER by the Fourth and Fourteenth Amendments to the United States Constitution including the right to be free of seizures without probable cause and to be free from excessive force.

**COUNT IV**
**Wrongful Death**

69. Plaintiff hereby incorporates by reference all the allegations set forth in the foregoing paragraphs as if fully restated herein.

70. The actions of Defendants PETERS and HUNTER caused the wrongful death of Mr.

RODNEY GEISER resulting in damages recoverable under R.C. §2125.02.


## COUNT V

### TITLE II AMERICANS WITH DISABILITIES ACT
### Failure to Train and the Explicit Use of Deadly Force Warning Accommodation.

71. Plaintiff hereby incorporates by reference all the allegations set forth in the foregoing

paragraphs as if fully restated herein.

72. On December 16, 2018, several events occurred that put the responding officers on notice

that RODNEY GEISER was emotionally disturbed and in need of psychological assistance.

73. Darrick Geiser is Rodney's Geiser's adult son. Darrick called the Appel Creek Police

Department and spoke with Patrol Nieman to report that he was concerned that his dad,

RODNEY GEISER had a gun and could be suicidal.  (Exhibit B.) *[Plaintiff incorporates by*

*reference this Exhibit by reference with the same force and effect as if herein expressly set*

*forth.]*

74. Patrolman Nieman then called the Wayne County Sheriff's Office and asked for deputies to

assist him.

75. Sergeant PETERS responded and found RODNEY GEISER sitting at the rear of the Harvest

Market.

76. When PETERS began to interrogate RODNEY GEISER, GEISER lifted a handgun to his

own right temple and told the police to leave him alone.

77. Deputy RUBENSTEIN also responded and during the encounter with RODNEY GEISER

was approached by TIMOTHY WADE.  WADE informed RUBENSTEIN that he was a

close friend of RODNEY GEISER. (Exhibit H.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

78. WADE informed RUBENSTEIN that RODNEY GEISER had a history of emotional events that RODNEY GEISER does this a "couple times a year". [Exhibit H At runtime 19:25.] *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

79. Deputy BUTLER interviewed family members of RODNEY GEISER near the scene and transmitted to other officers that RODNEY GEISER has a bad relationship with his son DARRICK GEISER – the complainant that telephoned NIEMAN. (Exhibit G.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

80. BUTLER learned that RODNEY GEISER had had a lot of medical issues in his history and suffers from depression which causes anger issues. When manifesting symptoms of his mental illness, RODNEY GEIGER would become depressed and angry. (Exhibit G. Runtime 15:37) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

81. BUTLER transmitted that RODNEY GEISER had stopped taking his medications. [Exhibit G at runtime 15:45]. *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

82. RODNEY GEISER walked around town for approximately 24 minutes while holding a gun to his head. (Exhibits D, F & H.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

83. RODNEY GEISER never exhibited any violent tendencies and did NOT threaten violence to anyone. (Exhibits D, F & H.) In fact. RODNEY GEISER said he didn't want to shoot anyone. (Exhibit D at runtime 18:23.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

84. On December 16, 2018 RODNEY GEISER manifested the symptoms of his mental illness by walking around Apple Creek while holding a handgun to his head.

85. Title II of the American Disabilities Act ("ADA") provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

86. Police Seizures are "services, programs, or activities of a public entity" requiring reasonable accommodation for one's disability.

87. When police are aware that they are dealing with and emotionally disturbed person, police have a duty to accommodate that person's disability by giving explicit warnings concerning the use of deadly force. In this case PETERS did not arrest RODNEY GEISER, but PETERS did "unlawfully seize" GEISER by shooting him.  PETERS failed to give RODNEY GEISER the required warning that deadly force was about to be used. (Exhibit F.)

88. Arrests/Seizures by Police Officers are "services" programs, or activities of a public entity" requiring reasonable accommodation for one's disability.

89. A warning must first be given before deadly force is used against a person, if feasible. (*Tennessee v. Garner*, 471 U.S. 1 (1985)).

90. The need for an explicit warning is even more imperative before police can deploy deadly force against an emotionally disturbed person with a diminished capacity.

91. This "explicit use of deadly force warning accommodation" was required to be given to the emotionally disturbed RODNEY GEISER before PETERS used deadly force against him.

92. Body cameras and security cameras recorded both audio and visual data concerning the events leading to PETERS killing RODNEY GEISER. (Exhibits F D & J.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

93. These recordings reveal that RODNEY GEISER appeared to be emotionally disturbed by holding a gun to his own head.

94. These recordings further reveal RODNEY GEISER repeatedly asked Officers NIEMAN, RUBENSTEIN and Defendant PETERS what type of conduct would cause the police to shoot him. None of those officers answered GIESER's question. (Exhibits D runtime 31:59.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

95. No law enforcement officer warned RODNEY GEISER that deadly force would be used if RODNEY GEISER continued to walk around town with a gun to his head. (Exhibits D, F & H.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

96. Law enforcement officers continuously advised RODNEY GEISER that he was NOT under arrest, was NOT going to jail and that the officers were there help him not hurt him – right up to point that PETERS shot RODNEY GEISER to death. (Exhibits D, F & H.) *[Plaintiff incorporates by reference these Exhibits by reference with the same force and effect as if herein expressly set forth.]*

97. PETERS' body camera captured his telephone conversation with Captain HUNTER. During that lengthy call PETERS stated reason for intending to use deadly force was that RODNEY GEISER had been wondering around the town with a gun to his head. PETERS did NOT tell HUNTER that RODNEY GEISER was pointing the gun at anyone or making any hostile gestures with the gun. (Exhibit F.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

98. Defendant PETERS did under color of law, deprive RODNEY GEISER of rights, privileges and immunities secured to him by the Fourth and Fourteenth Amendments to the United States Constitution, including the right to be free of seizures without probable cause and to be free of excessive force, when an explicit warning was not given that deadly force was about to be used. And the Wayne County Sheriff's Office violated the "TITLE II AMERICANS WITH DISABILITIES ACT" by its failure to train and require the "Explicit Use of Deadly Force Warning Accommodation.

99. On December 16, 2018, Wayne County did not have Sheriff Department policies in place to provide guidance to its deputies on how to handle emotionally disturbed persons such as RODNEY GEISER. (Exhibit A.)

100. Wayne County did not have the needed Sheriff Department policies:

   a. Setting the minimum training standard for its deputies to assist them in understanding, assessing and responding without lethal force to the types of irrational and non-compliant behavior which is typically exhibited by mentally ill persons such as RODNEY GEISER in their interactions with law enforcement.

   b. Concerning that training is widely available and implemented throughout the nation, (1) to prepare officers to understand and accommodate the apparent

irrationality of mentally ill subjects like RODNEY GEISER, bringing about their compliance, and as a result, renders the use of lethal force unnecessary; (2) to equip officers to evaluate the level of threat posed by mentally ill persons like RODNEY GEISER who are irrational and non-compliant, and to recognize when there is no viable threat, as in the case of RODNEY GEISER, thereby making resort to deadly force unnecessary; (3) mandates the use of specialized techniques which modify irrational and non-compliant behavior of mentally ill subjects like RODNEY GEISER, instead of resorting to lethal force, which is thereby rendered unnecessary.

c. Describing the necessity of managing the contact with mentally ill subjects like RODNEY GEISER by deliberately pulling back, and allowing the subject more time to respond, and providing clear explicit warning when deadly force is being contemplated which could modify the behavior of mentally ill persons such as RODNEY GEISER, such that they become more rational and compliant, thereby making resort to deadly force unnecessary.

d. Describing the necessity to call and consult for advice or bringing to the scene persons trained in crisis intervention or others trained in how appropriately to deal with mentally ill persons like RODNEY GEISER.

e. Having at hand and using non-lethal weapons to control mentally ill subjects like RODNEY GEISER which will typically modify the irrational behavior of such subjects and bring about compliance, thereby rendering lethal force unnecessary.

101. Because the lack of policies as described hereinabove, Sergeant Peters provoked responses from RODNEY GEISER and wrongly interpreted RODNEY GIESER's

irrationality and non-compliance as dangerous or unpredictable, such that he was deemed by PETERS to pose a threat to others. This unjustified, untrained interpretation of RODNEY GEISER's behavior which PETERS in part provoked by his shouting, pointing of firearms and bullying tactics motivated PETERS to use deadly force. Thus, PETERS wrongly assumed that RODNEY GEISER's failure to respond was indicative of criminal intent and imminent violence rather than understanding, evaluations, and responding to his behavior as symptoms of his mental illness. PETERS relied on these untrained and unjustified interpretations and assumption because there were no policies existent on 12/16/2008 in Sheriff's Office concerning adequate training needed as described above, to understand assess and respond without deadly force to the behavior of mentally ill persons such as RODNEY GEISER.

102.  When PETERS came into contact with RODNEY GEISER, on High Street (shooting scene) PETERS was aware that RODNEY GEISER was experiencing symptoms of his mental illness based on information provided to him from the dispatcher and other deputies and by the fact that RODNEY GEISER was holding a gun to his own head.

103.  If Wayne County would have had policies mandating the training and training updates as described hereinabove, PETERS would have realized that RODNEY GEISER would not respond to commands in a traditional way, that he would become upset by intrusive voices, that he would become scared or paranoid by being followed by armed officers pointing guns at him and could not follow commands and directions that would provoke him into becoming belligerent or defensive. And, PETERS would have known that an explicit warning was needed to apprise RODNEY GEISER about the threat of deadly force that would be used against him.

104.    RODNEY GEISER never attempted to flee from the law enforcement officers.  The

direction that RODNEY GEISER slowly walked was in general the direction of this home.


## COUNT VI

### Deprivation of Civil Rights under 42 U.S.C. §1983

105.    Plaintiff hereby incorporates by reference all the allegations set forth in the foregoing

paragraphs as if fully restated herein.

106.    Security camera footage obtained from the Wayne County Sheriff's Office in response to

a public records request shows that RODNEY GEISER was slowly walking away from

PETERS when PETERS shot and killed him. (Exhibit J.) *[Plaintiff incorporates by reference*

*this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

107.    That security camera footage, also shows that no one in view on the video when PETERS

killed RODNY GEISER while GEISER slowly ambled away with his head bowed down.

(Exhibit J.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force*

*and effect as if herein expressly set forth.]*

108.    The act of Sergeant PETERS in shooting, without warning, an emotionally disturbed man

who was posing NO imminent threat to him or to anyone else constituted an unreasonable

seizure in violation of the Fourth Amendment and/or the Fifth and Fourteenth Amendments

of the United States Constitution and violated clearly established law which police officers in

their position would have known.

109.    The unlawful and unconstitutional acts of Sgt. PETERS were the proximate cause of

RODNEY GEISER'S death.

## COUNT VII

**MONNELL CLAIM FOR COUNTY CUSTOM AS MOVING FORCE BEHIND EXCESSIVE FORCE AND FAILURE TO TRAIN AND THE EXPLICIT USE OF DEADLY FORCE WARNING ACCOMMODATION.**

110.     The Plaintiff hereby incorporates by reference all the allegations set forth in the foregoing paragraphs as if fully restated herein.

111.     The existing policy or custom in the WAYNE COUNTY SHERIFF'S OFFICE – when firearms are involved – is NOT to wait until someone is in imminent danger; but to use deadly force as a proactive measure. The existence of this unconstitutional policy, custom or practice is demonstrated in the admissions made by Captain HUNTER in a press conference held one-day after the RODNEY GEISER killing. (Exhibit K.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

112.     On December 17, 2018 – a day after RODNEY GEISER was shot to death – Sheriff Hutchinson introduced Capt. HUNTER to a press conference.  Hutchinson then sat down a short distance from HUNTER and listened to the conference. (Exhibit K.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

113.     During that conference HUNTER announced that when a person is armed with a firearm, the Sheriff's Office is not going to wait for something to unfold.  Hunter stated that the Sheriff's Office is going to take proactive action in those situations. (Exhibit K.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force and effect as if herein expressly set forth.]*

114.    Hunter then asked HUTCHINSON if he had anything to add and HUTCHINSON said

no. (Exhibit K.) *[Plaintiff incorporates by reference this Exhibit by reference with the same*

*force and effect as if herein expressly set forth.]*

115.    These statements constitute admissions and are admissible evidence that the Wayne

County Sheriff's Office had an already-existing policy or custom for its officers to use deadly

force BEFORE the minimum threshold of the existence of imminent danger is reached.

116.    It is the custom and practice of the Wayne County Sheriff's Office that deputies may use

deadly force in a preemptive fashion BEFORE the minimum threshold of the existence of

imminent danger is reached.

117.    The execution of this custom and practice inflicted a constitutional injury upon RODNEY

GEISER. His Fourth Amendment right to be free from an unreasonable seizure and

Fourteenth Amendment right to be free from excessive force were proximately caused by

Wayne County Sheriffs Office's custom of granting deputies the authority and unfettered

discretion to use deadly force without waiting for events to "unfold" and without needing the

existence of imminent danger to someone to justify the use of deadly force.

118.    Wayne County did not have a policy describing or requiring that a warning be given to

persons such as RODNEY GEISER that deadly force is going to be used.  The failure of

giving that warning to RODNEY GEISER denied him of his last chance to save himself.

(Exhibit A.) *[Plaintiff incorporates by reference this Exhibit by reference with the same force*

*and effect as if herein expressly set forth.]*

119.    The custom described above amounts to deliberate indifference by the Sheriff,

supervisors, deputies, Wayne County, Ohio, and Wayne County Board of Commissioners to

the constitutional rights of Mr. RODNEY GEISER with whom Defendants PETERS and

HUNTER came into contact on December 16, 2018.

120.    The custom and deliberate indifference of supervisors, deputies, Wayne County, Ohio,

and Wayne County Board of Commissioners were the moving force behind the constitutional

violation.

## COUNT VIII
## 42 U.S.C. §1983 FAILURE TO SUPERVISE

121.    The Plaintiff hereby incorporates by reference all the allegations set forth in the foregoing

paragraphs as if fully restated herein.

122.    Defendants HUTCHENSON and HUNTER were responsible for supervising the Wayne

County Sheriff's Office subordinate deputies during the incident involving Mr. RODNEY

GEISER on December 16, 2018.

123.    Defendants HUTCHENSON and HUNTER acquiesced to their subordinates' violations

of Mr. RODNEY GEISER's constitutional rights. Defendants HUTCHENSON and

HUNTER acted with deliberate indifference to the consequences of their failure to supervise,

and established and maintained a policy, practice, and/or custom that granted deputies,

including Defendant PETERS, unfettered discretion in conducting themselves during and

after the encounter with Mr. RODNEY GEISER, including during the use of excessive and

unreasonable force against Mr. GEISER.

124.    Defendants HUTCHENSON and HUNTER's failure to supervise was the moving force

behind the underlying constitutional violations suffered by Mr. GEISER.

**COUNT IX**
**42 U.S.C. §1983 RATIFICATION**

125.    The Plaintiff hereby incorporates by reference all the allegations set forth in the foregoing

paragraphs as if fully restated herein.

126.    The circumstances surrounding the killing of RODNEY GEISER has NOT been used by

Wayne County or the Defendants HUTCHINSON and HUNTER to implement policy

changes within the Sheriff's Office to correct the shortcomings described above.

127.    The circumstances surrounding the killing of RODNEY GEISER has NOT been used by

Wayne County or the Defendants HUTCHINSON and HUNTER to implement training

changes within the Sheriff's Office to correct the shortcomings described above.

128.    The circumstances surrounding the killing of RODNEY GEISER has NOT been used by

Wayne County or the Defendants HUTCHINSON and  HUNTER to institute any

disciplinary measures against PETERS that would prevent future shortcomings described

above from reoccurring.

129.    In failing to change their policy, institute adequate training measure, and discipline

PETERS for a wrongful filling, the Defendants Wayne County, Ohio, Wayne County Board

of Commissioners, Sheriff HUTCHENSON Capt. HUNTER of the Wayne County Sheriff's

Office have ratified the excessive use of deadly force by Defendant PETERS.

**COUNT X.**
**Survivorship Action**

130.    The Plaintiff hereby incorporates by reference all the allegations set forth in the foregoing

paragraphs as if fully restated herein.

131.    Mr. RODNEY GEISER experienced pre-death agony and conscious pain and suffering as

a direct and proximate result of each Defendants' conduct.

## COUNT XI.

### Willful, Wanton, and Reckless Conduct

132.    The Plaintiff hereby incorporates by reference all the allegations set forth in the foregoing

paragraphs as if fully restated herein.

133.    All the Defendants, while engaged in police functions, failed to exercise due care and

acted in a willful, wanton, and reckless manner. All the Defendants acted in a willful,

wanton, and reckless manner relative to the supervision, hiring, retention, situational

assessment and intervention, and use of force involving Mr. RODNEY GEISER.

134.    Each of the named Defendants, as set forth herein, engaged in negligent, reckless, willful,

and wanton conduct, such they are not entitled to the immunities set forth in O.R.C. §2744.01

*et seq.*

135.    As a direct and proximate result of the negligent, reckless, willful, and wanton

misconduct of Defendants, Mr. RODNEY GEISER sustained agonizing pain and suffering

and was ultimately killed for which Plaintiff is entitled to punitive damages.

### XII. JURY DEMAND

136.    Plaintiff requests a jury trial on all claims triable to a jury.

### XIII. PRAYER FOR RELIEF

137.    WHEREFORE, Plaintiff requests that this Court award:

a.  Plaintiff prays for judgment against Defendants jointly and severally, individually and

collectively in amount exceeding Seventy-Five Thousand Dollars as Compensatory

damages in an amount to be shown at trial;

b.  Punitive damages against individual defendants PETERS, and HUNTER (not the County of Wayne or the Wayne County Board of Commissioners) in an amount to be shown at trial;

c.  Costs incurred in this action and reasonable attorney fees under 42 U.S.C. § 1988;

d.  Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

/s/ William E. Walker, Jr.
  William E. Walker, Jr. (0038703)
  333 Erie Street South, #192
  Massillon, Ohio 44648-0192
  330.327.2509
  330.236.1826 [fax]
  williamwalker@gmx.com

*Attorney for Plaintiff*